| | |
|---|---|
| PATRICIA GEORGE JENKINS, ) <br> ) <br> Petitioner, ) <br> ) <br> vs. ) <br> ) <br> UNITED STATES OF AMERICA, ) <br> ) <br> Respondent. ) <br> _____ ) | **MEMORANDUM OF DECISION AND ORDER** |

**THIS MATTER** is before the Court on Petitioner's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. [Doc. 1].

**I.    BACKGROUND**

Petitioner was charged in a Bill of Information with possession with intent to distribute a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. § 841(a)(1).[1]  [Criminal Case No. 1:19-cr-00021-MR-WCM-1 ("CR"), CR Doc. 1].

---

[1] Petitioner pleaded guilty as charged the Bill of Information in exchange for the Government's dismissal of the Bill of Indictment filed in Criminal Case No. 1:18-cr-00133-1.  [CR Doc. 3].

Petitioner signed a written Plea Agreement in which she admitted to being guilty as charged and acknowledged: her minimum and maximum sentencing exposure; that the sentence had not yet been determined and an advisory guideline sentence would be calculated; that the sentence, up to the statutory maximum, would be determined at the Court's sole discretion; and that she would not be able to withdraw the plea as a result of the sentence imposed. [CR Doc. 3 at 1-2]. In the Plea Agreement, the parties agreed to jointly recommend: the amount of a mixture and substance containing methamphetamine that was known to or reasonably foreseeable by Petitioner was a total of 28.1 grams of 99% purity for a total amount of actual or pure methamphetamine of 27.8 grams; that the entry of the plea was timely; that if the Court determined from Petitioner's criminal history that she qualified as a career offender or an armed career criminal, such provisions may be used in determining the sentence; either party may argue their respective positions regarding any other specific offense characteristics, cross-references, special instructions, reductions, enhancements, departures and adjustments to the offense level; and that either party may seek a departure or variance from the applicable guideline range. [Id. at 2]. Petitioner expressly agreed to waive her appellate and

post-conviction rights except for claims of ineffective assistance of counsel and prosecutorial misconduct. [Id. at 4].

A Rule 11 hearing was held before Magistrate Judge W. Carleton Metcalf on March 1, 2019. [CR Doc. 19]. Petitioner stated that she and counsel had reviewed the Bill of Information and the Plea Agreement together. [Id. at 24]. Judge Metcalf read aloud the Bill of Information and the statute to which Petitioner was pleading guilty, explained the elements of the offense, and advised Petitioner of her potential sentencing exposure. [Id. at 25-27]. Petitioner stated that she understood the charges against her, including the maximum and minimum penalties and the elements of the offense. [Id. Doc. 27]. Petitioner agreed that counsel had discussed the sentencing guidelines with her and that she understood the Court could impose any sentence within the statutory limits and that her sentence may be lower or higher than the guidelines range. [Id. at 29-30]. She stated that she understood that the plea would be binding even if the sentence was more severe than she expected. [Id. at 30-31]. Petitioner confirmed that by pleading guilty, she was waiving the right to plead not guilty, the right to have a speedy trial before a jury with the assistance of counsel, the right to summon witnesses to testify on her behalf, the right to confront witnesses against her, and the right to receive the presumption of innocence. [Id. at

3

32]. Petitioner further stated that her plea was freely and voluntarily entered with a full understanding of what she was doing, that she was not promised anything other than the promises contained in the Plea Agreement, and that she was not threatened or in any way forced to enter the plea agreement against her wishes. [Id. at 33, 41-42]. Petitioner acknowledged that she knowingly and willingly accepted the Plea Agreement's limitation on the right to appeal and file post-conviction proceedings. [Id. at 45-46]. Petitioner confirmed that she had ample time to discuss possible defenses with counsel and was entirely satisfied with counsel's services. [Id. at 46].

In support of Petitioner's guilty plea, the parties submitted a written Amended Factual Basis that sets forth the following information:

> On June 5, 2018, officers with the Cherokee Indian Police Department (CIPD) were conducting a driver's license checkpoint at the intersection of Goose Creek Road and Highway 19 in Swain County within the Western District of North Carolina. Sgt. Wahnetah Toineeta observed a green pickup truck being operated by Timothy MCCOY approach and pull off into the public vehicular area of Jackson's Grocery at 2054 Birdtown Road. Toineeta had several encounters with MCCOY over the years and knew he did not have a license, but when she approached she asked anyway when MCCOY had acquired a driver's license. MCCOY stated that he did not have one and presented an identification card. Sgt. Toineeta also [ran] the truck's license plate and found it came back to MCCOY's passenger, Patricia George JENKINS. She did not have a license either.
>
> Neither individual had active warrants, but Sgt. Toineeta smelled marijuana coming from inside the vehicle. She also

observed JENKINS keeping her left arm tucked beside her with her arm over her stomach area. Sgt. Toineeta went to her patrol car to begin writing a citation but also called Sgt. John P. Taylor to run his K-9 around the vehicle. Sgt. Toineeta was writing the citation when Sgt. Taylor made contact with MCCOY. Sgt. Taylor instructed the occupants to roll up their windows and deployed his K-9. The dog alerted. MCCOY and JENKINS were removed from the truck and were handcuffed so that Sgt. Toineeta could finish the citation and Sgt. Taylor could search the truck. When JENKINS got out of the truck the K-9 lunged back towards the truck.

MCCOY and JENKINS were told they were merely being detained at that point, not arrested. Sgt. Taylor found an envelope with a large quantity of money. JENKINS claimed it and Sgt. Taylor said he would let her hold it while he continued searching. Sgt. Toineeta placed the envelope in JENKINS's back pocket and finished writing a driving while license revoked citation for tribal court. She explained that to MCCOY and told him the date and time of his first court appearance for that charge.

Sgt. Toineeta then approached the driver's side to assist Sgt. Taylor with the search of the trunk. She noted a burnt marijuana cigarette inside the vehicle and a **shotgun on the back seat**. MCCOY was asked about the shotgun and he said it was his. Sgt. Toineeta then walked back to MCCOY and JENKINS and told them then that due to the marijuana cigarette being found, both were going to be searched for controlled substances. JENKINS stated that they had let "Hawk" borrow the truck and he must have left them there.

JENKINS was searched first. When Sgt. Toineeta began searching the lower half of her body, JENKINS acted suspiciously – she barely moved her feet apart, her breathing became heavier, she began to fidget, etc. Along the front pelvic area Sgt. Toineeta felt a mass with defined corners. JENKINS said that she found it. Sgt. Toineeta removed a Camel cigarettes pack and inside was a crystal substance. MCCOY stated the substance was his. It was the intent of JENKINS to return the

5

controlled substance found on her person to MCCOY at a later time.

When MCCOY was searched officers found two pipes, an orange plastic container holding a plastic baggie with a crystal-like substance, and a large quantity of cash.

Sgt. Taylor's search of the vehicle found a tan backpack. When he opened it he located a **black pistol with rounds in the magazine**. He cleared it and made it safe. MCCOY claimed the pistol as well. Sgt. Toineeta told JENKINS that the money they had found would be seized due to the drug possession. JENKINS contradicted her earlier statement that the money was her[s] … by saying that the money was not hers. She wanted it given to her sister, who was coming to pick up the truck. Later, when Sgt. Toineeta began counting the money, she found JENKINS's identification inside the envelope.…

On June 6, 2018, CIPD Detectives C. McKinney and M. Shiver interviewed MCCOY pursuant to a *Miranda* waiver. MCCOY stated that when they saw the blue lights at the checkpoint JENKINS aided and abetted his crime in part when she placed a cigarette pack containing an ounce of methamphetamine in her pants pocket. … MCCOY claimed ownership of both firearms found. He stated that he has used methamphetamine for approximately ten years and that he and JENKINS smoke a gram a day. He also said that both he and JENKINS smoke marijuana.

MCCOY told the detectives that he sells methamphetamine to support his addiction to the substance. He described for detectives the quantities he buys and sells as well as his supplier, as well as additional information about drug dealing in the Cherokee area.…

[CR Doc. 5 at 1-3] (emphasis added).

Petitioner certified that the Amended Factual Basis was true and accurate and that, if the matter had proceeded to trial, the Government would

have been able to prove each of the statements in the Amended Factual Basis beyond a reasonable doubt. [CR Doc. 10].

The presentence investigation report ("PSR") identified Petitioner's base offense level as 26 based on the amount of actual methamphetamine for which she was responsible. [CR Doc. 14 at ¶ 26]. Two levels were added because Petitioner possessed a dangerous weapon during the offense. [Id. at ¶ 27]. Three levels were deducted for acceptance of responsibility, resulting in a total offense level of 25. [Id. at ¶¶ 33-35]. Petitioner had two criminal history points and a criminal history category of II. [Id. at ¶ 61]. The resulting advisory guidelines range was 63 to 78 months' imprisonment followed by three years of supervised release. [Id. at ¶¶ 105, 108].

Petitioner stated at the sentencing hearing on September 19, 2019 that her statements at the Rule 11 hearing were true and correct and that she would answer the questions the same if asked again. [CR Doc. 18 at 4]. The Court sentenced Petitioner to 63 months' imprisonment followed by three years of supervised release. [CR Doc. 16]. The Judgment was entered on September 24, 2019. [Id.]. Petitioner did not appeal.

Petitioner filed the instant *pro se* Motion to Vacate pursuant to 28 U.S.C. § 2255 on July 1, 2020.[2] Petitioner argues that counsel was

---

[2] Houston v. Lack, 487 U.S. 266, 276 (1988) (establishing the prison mailbox rule); Rule

ineffective for failing to object to the two-point enhancement pursuant to U.S. Sentencing Guidelines § 2D1.1(b)(1). In her motion, Petitioner further requests discovery and an evidentiary hearing.[3]

## II. SECTION 2255 STANDARD OF REVIEW

A federal prisoner claiming that his "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings …" in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an

---

3(d), 28 U.S.C. foll. § 2255 (addressing inmate filings).

[3] Specifically, Petitioner seeks to depose trial counsel Selena A. King to ask her "the reasons for her failures" and to present her own testimony, King's testimony, "additional evidence," and legal argument at an evidentiary hearing. [Doc. 1 at 11-12]. A § 2255 petitioner seeking discovery must demonstrate "good cause" for that request. Rule 6(a), 28 U.S.C. foll. § 2255. The Court finds that Petitioner's request for discovery is not supported by good cause, and it is therefore denied.

evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III. DISCUSSION

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. Const. Amend. VI. To show ineffective assistance of counsel, a petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced her. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). The deficiency prong turns on whether "counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." Id. at 688. A reviewing court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 689). The prejudice prong inquires into whether counsel's deficiency affected the judgment. See Strickland, 466 U.S. at 691. A petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. The petitioner "bears the

9

burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a reviewing court need not even consider the performance prong. Strickland, 466 U.S. at 670.

U.S. Sentencing Guidelines Section 2D1.1(b) identifies several "Specific Offense Characteristics" that, when applicable, warrant an enhancement to the offense level. The specific offense characteristic at issue in the instant case provides that, "[i]f a dangerous weapon (including a firearm) was possessed," the sentencing court is to "increase by 2 levels" the offense level. U.S.S.G. § 2D1.1(b)(1) (2018). The weapon enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. 2D1.1 app. n. 11(A). Thus, for the enhancement to apply, the government carries the initial burden of "proving possession of a weapon in connection with drug activities" by a preponderance of the evidence. United States v. Manigan, 592 F.3d 621, 632 n.8 (4th Cir. 2010). The government must prove that "the weapon was possessed in connection with drug activity that was part of the same course of conduct or common scheme as the offense of conviction." Manigan, 592 F.3d at 628-29 (quoting United States v. McAllister, 272 F.3d 228, 233-34 (4th Cir. 2001)). The government does not need to prove

"precisely concurrent act," such as "a gun in hand while in the act of storing drugs." United States v. Johnson, 943 F.2d 383, 386 (4th Cir. 1991). However, it must at least prove "a temporal and spatial relation" linking "the weapon, the drug activity, and the defendant." United States v. Bolton, 858 F.3d 905 (4th Cir. 2017) (quoting United States v. Clark, 415 F.3d 1234, 1241 (10th Cir. 2005)). "Proof of constructive possession of the dangerous weapon is sufficient, and the government is entitled to rely on circumstantial evidence to carry its burden." Manigan, 592 F.3d at 629. It is the defendant's burden to show that a connection between her possession of a firearm and her narcotic offense is "clearly improbable." United States v. Harris, 128 F.3d 850, 853 (4th Cir. 1997).

In the instant case, the two-level enhancement was well supported by the Amended Factual Basis, which Petitioner certified is true. The Amended Factual Basis provided that: officers found a shotgun and a pistol in a truck registered to Petitioner in which she was traveling; Petitioner had 28.1 grams of methamphetamine on her person at the time; an envelope containing a large amount of money and Petitioner's identification were located in the truck; and co-Defendant McCoy, who was driving the truck, admitted that he sells drugs and that Petitioner aided and abetted him by holding the methamphetamine. These admissions easily satisfied the Government's

burden of demonstrating a temporal and spatial link between the firearms, the drug activity, and Petitioner. See, e.g., United States v. Canter, 664 F. App'x 347 (4th Cir. 2016) (the court properly applied the two-level enhancement for possession of a firearm where a shotgun was discovered in his vehicle near a safe containing methamphetamine and a significant quantity of cash was connected to the drug-trafficking offense); United States v. Dismukes, 454 F. App'x 167 (4th Cir. 2011) (application of the firearm enhancement was not erroneous where a pistol was found in defendant's vehicle which, along with crack, was driven from Michigan to West Virginia for the purpose of distributing crack and the court found that the pistol could have been accessed relatively easily); United States v. Carranza, 443 F. App'x 797 (4th Cir. 2011) (application of the firearm enhancement was not erroneous where defendant left his loaded handgun inside his vehicle when he went inside a store to consummate a cocaine transaction; although he did not take the gun with him during the drug deal, it was readily available to him during the transportation phase of the transaction).

Petitioner's argument that the firearms were owned and controlled by McCoy is unavailing because constructive possession is adequate to satisfy § 2D1.1(b)(1); ownership is not required. Petitioner's argument that counsel

should have objected that the government "never came forward with any evidence to establish that it was NOT clearly improbable that the firearms were connected to the offense" [Doc. 1 at 9] is based on a misapprehension of the law. As previously stated, there was adequate evidence to support the enhancement and it was Petitioner's burden to establish that it was clearly improbable that the firearms were connected to the offense. Petitioner has not come forward with any evidence to support such a showing.

Counsel cannot be deemed ineffective for choosing not to object to the two-level § 2D1.1 enhancement that was supported by the admitted Factual Basis and which, if raised, would have been overruled. Petitioner has failed to demonstrate either deficient performance or prejudice and, accordingly, the § 2255 Motion to Vacate will be denied.

## IV. CONCLUSION

For the foregoing reasons, Petitioner's § 2255 Motion to Vacate is denied.

Pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable

jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

## **ORDER**

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's Motion to Vacate under 28 U.S.C. § 2255 [Doc. 1] is **DENIED**; and

2. The Court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**

Signed: July 13, 2020

_____
Martin Reidinger
Chief United States District Judge